## SOUTHERN RAILWAY CO. v. BLACK DIAMOND COLLIERIES, INC.

Eastern Section. February 11, 1928.

Petition for Certiorari denied by Supreme Court, June 16, 1928.

Charles H. Smith, of Knoxville, for plaintiff in error.
D. C. Webb, of Knoxville, for defendant in error.

SNODGRASS, J. This is a suit for damages, alleged in the sum of $15,000, as the result of damages to one and the destruction of another railroad bridge, by a runaway crane weighing seventy tons, which escaped from the coal yards of the defendant and the custody of its employees, and got out upon the main line of the plaintiff's track. It passed over the first iron bridge of the plaintiff, with its boom about forty feet long erect, and swept away its superstructure, and broke down and destroyed the next iron bridge it encountered, designated as No. 5. The suit is predicated upon the negligence of the defendant alleged as occasioning this damage, and also upon an express contract, under which it was averred that the defendant is also liable for the damage occasioned the plaintiff.

The defendant, as the owner of the collieries, near Coal Creek, Tennessee, was engaged in mining and shipping coal from this plant, and the plaintiff, a railroad company engaged in the business of carrying passengers and freight for hire, and operating extensively through several states, was hauling and transporting this coal as a part of its general business, which, as indicated, appears to have been extensive.

The mining company appears to have been well facilitated in the conduct of its business, having an overhead tipple and several tracks

extending thereunder connected with its mines, and constructed so that empty cars brought in over the main track of the railway could be pushed through west of the tipple and left under their separate braking power, and then dropped down by gravity, and which could, by the aid of switches, be distributed to these various tracks under the tipple, where by means of their brakes they were halted and loaded, and then, by the aid of the friendly gravity, continued on down further east in the yards of defendant and parked upon the tracks where the railway would come in, pick them up and haul them away in trains to their shipping destination. The defendant company was further facilitated by a storage track located ——— of all these tracks, as appears from the map, but connected with its other tracks by switches. The object of this storage track was to guard against a lack of sufficient coal cars at all times to accommodate the quantity of coal mined, when they would store the coal along this storage track, and then upon occasion by the aid of this crane, which had a forty-foot boom and a two-ton coal bucket, with such adjustable construction of the machinery as permitted its operation somewhat on the order of a steam shovel, would load this coal into the coal cars for shipment. And upon occasions, if so desired, this crane was used for coaling the engines of the plaintiff.

It seems that the grade of this storage track and of the other tracks was about two per cent, or something near that, falling toward the east or Coal Creek, and that one or more derailing devices had been placed on these tracks of the yard, so as to prevent cars or anything else running upon the tracks that might be dangerous if allowed to escape from their moorings and get out upon the main line, or otherwise become a menace of injury both to life and property. One of these derailing devices had been placed eastwardly from the tipple and just below this storage track, which apparently under a contract between the parties had been built or extended. This contract was filed as exhibit to the declaration, and among its provisions was a clause of indemnity as follows:

"That it will indemnify and save harmless the railway company against any and all damages resulting from negligence of the party of the second part, its servants and employees in and about said industrial track and the right of way therefor."

This clause also contained other provisions not necessary to be quoted, except the following:

"The said Railroad Company hereby stipulates for this protection as a condition of its agreement herein expressed to afford the above described terminal service and facilities to the party of the second part elsewhere than at its regular station."

The declaration contained various specifications of negligence in the escape of the crane, to which there was simply a plea of not

guilty, and under the issues thus presented the cause went to trial before the judge and jury.

At the conclusion of the plaintiff's proof, and again at the close of all the proof, there was a motion by the defendant for a directed verdict. Both these motions were overruled and the case submitted to the jury, who returned a verdict in favor of the plaintiff in the sum of $8,000.

There was a motion for a new trial by the defendant, more than once amended, and finally overruled by the court, after requiring the plaintiff to enter a remittitur which reduced the judgment to $5000, which was done under protest; and, being entered in that sum, both sides have appealed and assigned errors, the plaintiff mainly to the action of the court in requiring the remittitur, and the defendant insisting—

"I. The court erred in failing to direct the jury to bring in a verdict in defendant's favor.

"II. The court erred in holding that the verdict of $5000 was not so excessive as to indicate partiality, passion, caprice or corruption on the part of the jury.

"III. The court erred in submitting over defendant's objection the following testimony of the plaintiff's witness, H. C Libby:

" 'Q. Now, Mr. Libby, if that bridge No. 5, the one that was wrecked, is restored, replaced just as it was before this wreck occurred, tell the court and jury what it would cost to replace it, to restore it as it was.'

" 'Judge Webb: I want to object to that estimate of damages! The true measure of damages would be what it was worth the day before it was destroyed.'

" 'The Court: What was the true value—'

" 'Judge Webb: The value of the bridge as it was that day, it might have had only one day's more life.'

" 'The Court: What is your answer to that?'

" 'Mr. Smith: I don't know any other rule. Your Honor, than the replacement value of the railroad bridge. Even if it is not a finality, it is certainly a circumstance to show what the railroad suffered.'

" 'The Court: You mean the condition it was in immediately before it was destroyed?'

" 'Judge Webb: Yes sir.'

" 'The Court: The court does not think your objection to the question is good in that form, Mr. Webb.'

" 'Judge Webb: I reserve an exception!'

" 'Q. Tell us, answer the question, Mr. Libby, as to how much it would cost to replace that bridge No. 5 in the condi-

tion it was the day this accident occurred. A. Just previous to this wreck our valuation engineers had taken a complete inventory of the material in this bridge, which was subsequently approved, the Interstate Commerce Commission, using our accountant's figures and materials in that bridge and current prices, we estimated it would cost $10,831.73 to replace it.'

" 'Q. Let me see your itemized statement.'

" 'The Court: What is your question, Mr. Webb?'

" 'Judge Webb: I asked him to let me see his itemized statement. I am still keeping up my exception to that replacement value, but it has been overruled.'

"IV. The court erred in instructing the jury that the measure of damages was the reasonable cost of restoring said property to the same condition said property was in immediately before said property was thus damaged by the defendant."

There were two other assignments of error, to the effect that the court erred in refusing to give to the jury certain special requests, setting them out, but as it does not appear from the bill of exceptions that he was ever properly or seasonably asked to give them to the jury, we do not think he can be put in error for failing to do so. It is true that in the motion for a new trial there is a statement that "the court erred in refusing to give to the jury as a part of his charge the following instructions or special request presented on behalf of the defendant, viz:" then follows the request and a similar statement with reference to the other. Whether this request was presented at the proper time does not appear. Even if the recitation in the motion for a new trial could be regarded as sufficient evidence of anything other than what was the insistence of counsel who made the motion rather than the fact of the case, (See Frazier v. State, 117 Tenn., 430) it does not appear by it when the requests were made. In Ency. Digest to the Tennessee Reports, Vol. 7, page 237, a number of cases are cited as holding that—

"Requests for further instructions must be presented after the general charge is delivered, or the court will commit no error in refusing to give them."

Also the following, on the same page:

"Special or additional instructions must be presented after —not before—the delivery of the original charge to the jury." Chesapeake etc., R. Co. v. Foster, 87 Tenn., 671, 13 S. W., 694, 14 S. W., 428.

"Although a party may at the commencement of the trial, after asking the judge to charge the jury in writing pass to the judge specific instructions which he desires to have embodied in the charge, he cannot assign as error the omission of the

judge to include some of these instructions in the charge unless his attention be called to the omission after the charge has been delivered and he then requested to give them in charge." Roller v. Bachman, 5 Lea, 153.

The presumption is to support the action of the court as proper, if there be conditions in which such actions are proper. If the motion for a new trial can be looked to as evidence of the fact that such a request was made to the court, it fails to show when it was made. The proof should negative every condition under which the presumption obtains in favor of the propriety of the court's action, and the recitation will not be construed so as to defeat this presumption.

We think the verdict of the jury has settled the question in favor of the plaintiff as to the negligence of the defendant proximately causing the damage to the bridges, and also as to any question of contributory negligence on the part of the plaintiff as barring any recovery, if it could be involved under the contract of indemnity, was likewise settled in favor of the plaintiff and against the contentions of the defendant, and that the only real question in the case is as to whether or not the court was in error in his charge to the jury, or in the rejection of the evidence referred to in the assignment of error; and, if the judgment is supported by the evidence, whether or not it is so excessive in its present amount as to indicate passion, prejudice or caprice; or, upon the assignment of the railroad company, as to whether or not the original judgment of $8000 was so excessive as to indicate passion, prejudice or caprice on the part of the jury.

The first assignment of appellant defendants is, that the court should have directed a verdict, and this is not predicated upon any insistence that there is no evidence to support the verdict, but merely upon alleged assumption of risk and proximate negligence upon the part of the plaintiff in leaving the derailing apparatus open when it came in with its cars, and while the same were above said derailing device. With reference to this it is insisted that the Superintendent of the Coal Company called the railroad's attention to the necessity of having the derail on this storage track over which the crane got away, and that the railroad company assumed this risk by undertaking to move the derail from the company's storage track to the main track leading into that property so as to protect all above it, and that since the railroad company had agreed to have entire control of said industrial track and the operation thereof, and that it might use the same as well for the benefit of third persons, that it is apparent they have no right of action against the Black Diamond Collieries. It appears that when they were putting in this additional facility of the storage track the derail was

at that time placed on their main line to the mine at approximately half the distance between the two ends of the storage track as now built, and that the Superintendent of the Coal Company had a conversation with the foreman of the Railroad Company building the line as to that derail, which was detailed as follows:

"Q. Did you have any conversation with him as to that derail? A. Yes sir.

"Q. State to the jury what the conversation was, and what happened. A. What happened after the track work was finished?

"Q. Yes. on the storage track. A. On the storage track, I talked to Dock (meaning Dock Branch) about placing the derail on this storage track, and he said he would move this one from this point and locate it there in that position, and it would protect everything above that.

"Q. Now, Mr. Peck, how far is that derail located below your tipple? A. Between seventeen and eighteen hundred feet.

"Q. Now how far is the derail No. 1 that is upon that side track below your tipple? A. Approximately one thousand feet."

He had previously testified that derail No. 2 was located on this track which the Southern speaks of as their main line to the mine, at the place where he said he had his pointer, so that the place where derail No. 2 was moved from was at the time of the building or extension of the storage track on the Southern line leading into the mine, and when it was removed below the east end of the storage track as testified to so as to protect all above, it was still on the Southern's track leading into the mine.

"Q. Now when the suggestion is made that there is no danger to the crew on the locomotive to operate above a derail. which derail possibly cause any danger there? A. Only No. 1.

"Q. Is that other far enough away to give plenty of room for protection? A. Yes, sir, our loaded cars coming from the tipple are stopped above the tipple, the engine's crew came there, throw the derail so their cars can get out and the engine get in, they have no control by anything except hand brakes, as I understand it, until they have run some distance, and that derail No. 1 was the derail that was liable to cause the engine crew trouble."

This testimony was designed by appellant defendant to negative what had been previously testified to, that on going up there that morning they had found the derail on the main track closed, and that they had opened it on going in, and left it open because it was not safe to go in there and work above it on the cars, because a cut of cars would shove you over it, it would wreck you, and the

engine and cars would be upon the ground; that on account of switching necessities they do not couple up the air until the train is made up. Mr. Peck himself, on cross-examination, testified:

"Q. When the engine comes in there and takes charge of the loaded cars—I mean the locomotive engine comes and takes charge, the engine has to run some distance to get up air, so as to control the train by air? A. I understand so.

"Q. Don't you know as a matter of fact they have to run as much as a half mile before they get the air built up so as to control those heavy trains? A. I would not be positive, I am not a locomotive engineer.

"Q. It is a fact that it does take time to build up the air so you can control it by air? A. Yes."

And then on re-direct examination:

"Q. You don't mean to say that a locomotive train is ever free from protection for a half a mile from brakes? A. When they start out with loads they have no air on the cars, and they have to run some distance to build it up.

"Q. They have no air on the engine? A. Yes, but not on the cars, they would have to run down in the hollow first."

So it would seem to appear that, notwithstanding the Railroad Company had removed derail No. 2 still further down and below the east end of the storage track and again attached it to its main line entering these yards as a matter of protection to all above it, there is evidence to show, as a reason for leaving it open, that heavy trains taking coal out of those yards were still liable to be pushed over this lower derail and wrecked. So that, without regard to the Railroad Company being in control of its own main track, the standard of inquiry being what an ordinarily prudent man would have done under the circumstances, it was a question for the jury to determine, when considered in connection with the inconvenience to be avoided and the danger incurred by the cars leaving this derail device closed while the engine and cars were above it, whether the leaving it open was an act of negligence. Moreover, it is evident that the derailing apparatus was designed more as a protection against lawless cars escaping their moorings, rather than cars under the immediate control of their operators, and when considered in connection with the fact that the crane was actually in charge of the defendant's servants, a further circumstance is matured for consideration as affecting the question of whether or not it was negligence at the time to leave it open. And while the contract does show that to a certain extent the plaintiff was to have control of the storage track, that control, while it was operated, was subordinate to the necessities of the defendant for whom it was built.

and who was in the control and operation of the crane when it escaped and went out upon the main line, effecting the damages.

We think therefore upon the main question of liability it was only necessary to determine if the escape was due to the negligence of the defendant, which was alleged in the declaration, together with the contract obligation to be responsible therefor. The jury has settled this question in favor of the plaintiff, and there is evidence to support that conclusion. That the company well knew of the hazards of the use of this heavy crane upon such a grade as it was used on in the service in which it was employed we think is shown from all the facts and circumstances. The specifications of negligence are—

"That the operator of the crane was inexperienced, reckless and incompetent, all of which was known to the defendant: that said crane and the brakes thereon were old, worn, defective, out of repair and insufficient to control said crane, particularly on a wet track.

"That the old, worn and defective condition of said crane and its brakes was known to the defendant, and it had been requested by the operator thereof to renew and repair said brakes, but had negligently failed or refused to make said repairs.

"That the defendant was negligent in undertaking to remove said crane with defective and insufficient brakes down grade on its storage tracks when its wheels, brakes and storage track were all wet and slippery, and when the derail protecting plaintiff's main line track was open.

"That the defendant's agent and servant, the operator of said crane, negligently jumped from and abandoned said crane when the brakes failed to work, when he could and should have lowered the boom on said crane to the ground, and could and should have thus prevented said crane from running away onto plaintiff's main line track.

"That defendant was negligent in undertaking to move its crane with defective and insufficient brakes down a wet and slippery track, when the derail was open, and when defendant knew that unless said crane was controlled and stopped it would enter upon plaintiff's main line track and cause damage to plaintiff's property."

We think most if not all of these specifications of negligence are supported by the evidence. Lephew Brown, who was operating the crane at the time it escaped, and who had worked for the company seven or eight or ten years, and went to work with the hoist engines and crane, and who had operated this crane for several weeks or several months before the day of the trouble, testified that

the company had bought the crane at Canton, North Carolina; that it had been used, that he worked on the crane when it first came there, and was the first man to operate the crane shortly after it came there. He testified that the only braking system it had was friction; that there was a steam jam brake on it when it was sent there, but that the brake would not hold; that is, it did not work very good; that the jam brake when it did work was something similar to air on a railroad car, the steam went in there and pressed the shoes up against the wheels the same as on a freight train, but that this steam jam brake was not in working order on April 28, 1923; that it had been completely out of order a good time before that. He testified that the best he remembered when it was sent there it would hold some, but it could not hold all the crane; that they would have to use the friction sometimes, would use the friction too; that when they talked about using the friction, that brake system was also used to hold the crane, move it up and down the track; that he used it because that was about the only way he had of holding it. Asked to explain what was meant by the friction system, he testified:

"A. I don't know whether I can explain it so they can understand it or not; maybe I can; it was drum in cone shape back on the shaft, was iron, on these irons was friction; when this friction went in there, pressed into that drum tight, and put the friction on that drum until it put pressure on it, and that would hold it;" that they used a lever to put on or bring about the friction. Asked how the lever worked and what strength or power you had to have behind the lever to make the friction strong enough, he replied: "Just a big, long lever; how to get up this friction, I could hardly explain it." He testified that you could not put any more power on it than a man could pull against; that they had no steam upon it, "just operated it with your hands." He was asked:

"Q. What had been your experience before this April 28, 1923, as to whether or not you could handle this crane and keep it from running away up and down that storage track, just with that friction brake? A. I had been operating it down there previous to that time.

"Q. You had been operating it with that friction brake? A. Yes, sir.

"Q. Had you always been able to hold it on the track, and stop it where you wanted to? A. We had by always being very careful, with one or two exceptions—we come pretty near—

"The Court: Will you speak a little louder?

"The Witness: One or two times we come pretty near having a little runaway, but we managed to get it stopped.

"Q. State to the jury how you managed to get it stopped. A. I boomed it over into the sand house and checked it, and had a man on the ground with a scotch or prop, or whatever you want to call it.

"Q. What do you mean by 'boomed it into the sand house?' A. The sand house was close to the track, and I was above the sand house, and I seen the crane was getting a start on me, and I spun my brake system and seen it was not going to hold me altogether, and I sort of boomed over into the sand house and checked it.

"Q. You turned that boom with the bucket on it there into the sand house? A. Yes sir.

"Q. And that checked you? A. Yes.

"Q. And that stopped or checked you? A. It checked the crane so the man on the ground could scotch the thing.

"Q. Could you put a scotch under it? A. Yes sir.

"Q. How far did it run on that occasion before it boomed into the sand house? A. Only a short distance.

"Q. About how far? A. I judge 150 feet, I would not say that much for sure.

"Q. Were you able to stop the crane with the braking system? A. Part of the time it would work.

"Q. I mean that time you started to run away and boomed into the sand house. A. No sir.

"Q. You could not stop it; how long was that before this accident April 28th? A. I don't know how long it was.

"Q. Did you make any report to anybody about the brake system before this accident of April 28th? A. I don't know whether I reported it directly or indirectly, it had been reported.

"Q. Who did you report it to? A. I say I don't know whether I reported it directly to the manager, superintendent or yard foreman; I am pretty sure—

"Judge Webb: I am objecting to that testimony, Your Honor, he says he don't know—

"Mr. Smith: He has given three people to whom—

"Judge Webb: He says he don't know whether he gave it directly to anybody, and I am objecting.

"The Court: What it your answer?

"Mr. Smith: I will put it in another form:

"Q. What is your best recollection as to whether or not you made any report of the brake system, and if so, what is your best recollection as to whom you made the report?

"Judge Webb: I object to that, because he said he didn't know whether he made a direct report or not.

"The Court: The objection is sustained. Did you talk to any of the company's officers? A. I think I did, but I am not sure about that. I am pretty sure about it.

"Judge Webb: I will object to his testifying.

"The Court: What is your answer, Mr. Smith?

"Mr. Smith: I will ask you this question, then:

"Q. Whose business was it to keep the brake apparatus on that crane in repair? A. That was the mechanic's business, I suppose, outside of the crane man.

"Q. Did the company have mechanics on the job? A. Yes sir.

"Q. Did the mechanics or anybody else for the company work on that brake system on the crane before April 28th? A. Yes, I think they had done a little work in regard to the steam jam brake, the best I remember.

"Q. Did that put it in order so you could use it? A. No, sir, they never were.

"Q. This morning of April 28, 1923, who was on the crane besides you? A. You mean the time it ran away?

"Q. Yes. A. A fireman by the name of Burches.

"Q. What were you using the crane for that morning? A. I don't remember what kind of work I was going to do; at that time the switch engine was above, it comes in there to get coal; I was aiming to drop down to the coal pile where I could reach the switch engine with the crane and give it coal."

He testified that while the switch engine did not get coal there every day, it frequently did; that most of the time it got coal above the tipple, but that they had coaled a few times on the new track, the best he remembered, and that this time he was going to coal him from the new track. He testified that it was raining that morning when he went to work—wet day; that he found the crane setting in below the hoist house on the storage track; that the fireman already had steam up, and that when he took charge of it he put the boom in position headed toward Coal Creek. He was asked:

"Q. How high in the air up or down was the boom? A. It was up, I guess, about forty-five degrees.

"Q. At about a forty degree angle? A. Yes.

"Q. How was it headed? A. Straight with the track."

His description of how it got away is, we think, further and well illustrative of the incapacity of the brakes. He was asked:

"Q. When you started to move the crane, how far did you intend to move down the storage track? A. Well, it was not over 200 feet. I don't think.

"Q. How did you start it, Mr. Brown? A. I picked the bucket up off the ground, put in my travel friction (there were

other brakes on the machinery that operated or checked in proper place the machinery that was on the trucks when it was being employed in the work for which it was designed in loading the coal) as I called it, put on my drum brake and started down.

"Q. Is that this friction brake you were talking about? A. That is one of them, there is two.

"Q. What is that drum brake you were talking about? A. That, in other words, locked the wheels tight, the gear—as long as the friction was out it would travel free; as soon as the friction was pulled in, put the friction on the drum that was connected up to the drive wheel—

"Q. That was a sort of brake arrangement, was it? A. That is what we used.

"Q. What happened when you started it down the track? A. I started off very well, pulled my drum in and it seemed to check the crane, the best I remember, came pretty near to stopping, I don't remember whether it did or not; I released it, and picked up more speed, and when I tried the friction again I could not get them to hold.

"Q. What happened? A. The crane ran away. . . .

"Q. What did you do when you saw the crane was out of control going down toward that car loaded with coal? A. I left the crane.

"Q. You jumped off? A. Yes sir.

"Q. What did you do? A. Got a scotch, a piece of timber and tried to throw the scotch under it, but I could not get any headway."

He testified that the crane ran on over the scotch, knocked against the coal car, and the car went on, with the crane following; that the car went into Coal Creek, Tennessee and the crane went into the bridge and tore it up—stripped the braces off and the top part of the bridge below the mine; that handling the crane in wet weather it affected the friction; that when it got wet or slick, the water got on it, it would not hold as well, that it was just metal against metal. He was asked:

"Q. Any lining? A. The block I think was brass.

"Q. How much, do you suppose, how much metal against metal was there? A. There was several of these blocks, there was about four inches, I guess, in rectangular shape, like a wedge, about four-inch bearing on the drum, and I believe there was four inches on these.

"Q. There were four of these blocks, each with a surface about four inches long; how wide? A. About the same, I guess.

"Q. About four inches wide; brass against metal. A. Yes.

"Q. You hold against them with a lever? A. Yes, it had notches on it, with a rim; you could pull it in, and it would stay there."

He testified on cross-examination that he had set all the brakes before leaving the crane, all that was possible, one of which doubtless held the boom in proper position for stripping the overhead structure of the bridge. On re-examination he testified that there were two friction brakes for stopping the crane after it got started, the one he mentioned and the foot brake referred to in the cross-examination, on the main drive shaft, but that they never did depend on that; that it never would hold the crane; further, that they had a dinky engine, which they had sometimes used to move the train up and down the track. Asked why they had done that, he replied: "To hold the crane;" that the engine had brakes under steam; that part of the time they coupled the engine with the crane going down grade, and part of the time they would bring the crane down against the dinky and hold it up.

"Q. It depends on how you were going? A. Yes.

"Q. That was done to hold the crane? A. Yes."

There was evidence of course tending to show the sufficiency of the brakes, but it is impossible to come to any other conclusion in reading the evidence just referred to than that the braking apparatus operating on the wheels under the trucks carrying this heavy machinery were insufficient for its safe operation on this grade. And while there was evidence tending to show that a proper inspection had been maintained, and as stated that the brakes were sufficient, and that the steam jam brake appliance was but an experiment to save expensive repairs of the metal friction, that wore out rapidly, and that after the crane was taken from the water the brakes which were claimed as sufficient were found locked or applied, the answer is that it did not keep the wheels under the truck from operating, and we think there is abundant proof from which the jury could reasonably find that it was due to the negligence of the defendant on that morning that the crane was allowed to get away and do the damage complained of; that the brakes, if they were ever sufficient for this weighty machinery on such a grade, had become entirely insufficient. The expedient of swinging the boom to one side and lowering it to the ground, which had been successfully used on a former occasion to stop the crane, was not even resorted to. On the contrary, erect and in a position of menace to the overhead structure of the bridge it was locked in place and the crane allowed to escape upon its destructive rampage, nor apparently was there any sand available on this wet morning to prevent any slipping of the wheels, if such there was.

We are satisfied that under the facts of this case the jury were well warranted in finding a liability, and the first assignment of defendant appellant is overruled.

Regarding the third assignment, that the court erred in submitting the testimony therein set out, we think the exception went more to its weight than to its competency. The question was addressed to what it would cost to restore the bridge to the condition it was in just before the wreck occurred. That, indeed, was the measure of the plaintiff's proximate damage, for that implied the same kind of material and workmanship. If there were no questions as to depreciation or the propriety of the use of such material, the question would have presented no difficulty, as that would have been the real value of the bridge. The objection assumes such depreciation or impropriety of such construction, which did not appear from the matter of the question, and which should rather be made to appear from rebutting proof that there had been such depreciation, or that material used in the original construction had become obsolete, affecting unfavorably its value. We do not think there was any error in the court's action on this evidence, and this exception is overruled.

It is asserted in the fourth assignment that the court erred in instructing the jury that the measure of damages was "the reasonable cost of restoring the property to the same condition said property was in immediately before it was thus damaged by the defendant. Many authorities are cited to show that the measure of damages was the reasonable value of the bridge at the time of its destruction, and it is insisted that it is a physical impossibility to restore a bridge thirty-five years of age to its condition previous to the accident. The case of Margaret Burke v. Louisville & Nashville R. R. Co., 7 Heisk., 465, is referred to, where was criticised as inaccurate and calculated to produce confusion in the estimate of damages a charge that "the measure of damages would be just what it would cost in cash at the time and place of the burning to replace the house and each article consumed in it." It was said in that case that "the better instruction would be that the measure of damages would be the value of the property destroyed at the time and place of the destruction." We think the charge under investigation is more restrictive than the one criticised in Burke v. Louisville & Nashville R. R. Co., supra, for in addition to using the word compensation, it limited the cost of restoration to the same condition said property was in immediately before said property was thus damaged by the defendant, the entire paragraph from which the excerpt was taken being as follows:

"If you find in favor of the plaintiff, it will be your duty to go further and assess its damages at such an amount as in your

sound judgment and discretion will compensate the plaintiff for the damages if any thus occasioned by the defendant; that is, the reasonable cost of restoring said property to the same condition said property was in immediately before said property was thus damaged by the defendant, mindful of the court's instruction touching remote contributory negligence if any on the part of the plaintiff."

This we think was equivalent to the charge that the measure of damages would be the actual value of the bridge at the time of its destruction, for if it was put up out of the same kind of material and workmanship, and at reasonable cost, that would be the actual value of the bridge, which could not be arrived at without a consideration of the restoration cost. The quarrel would seem to be one with the terminology of the judge, who must be allowed to select his own phrase, provided he express accurately his instruction. We think the insistence that it was physically impossible to restore this bridge, at least approximately, is assumption. At any rate a charge similar to the one under investigation was approved in the case of Anderson v. Miller, 96 Tenn., 35, in which the court said:

"In regard to the measure of damages the charge of the court was correct in directing the jury that it would be the reasonable cost of restoring the property to its former condition. This does not mean, as argued by counsel, that it was the cost of a new building, the same as that destroyed, and the jury could not have so understood it, but the proper construction was that the building as restored should be of equal value to that destroyed, taking age and depreciation into consideration. In other words, to reinstate plaintiff as before the fire."

Counsel insists that while a restoration would be the proper measure in case of the one bridge partially destroyed or damaged, that it is not and cannot be the measure of damages for the one wholly destroyed. But we cannot see any reason for the distinction, the difficulty of restoration in kind being only in degree. We think the case last above quoted from is authority in either case, even if there should be any real distinction between the value of the bridge when it was destroyed or the cost of its restoration to the condition it was in when it was destroyed.

The second assignment of error raises some interesting questions as to what is reviewable under Section 1 of Chapter 29 of the Acts of 1911. As finally amended in the motion for a new trial the ground of complaint with reference to the amount is, that the verdict of $8000 was so excessive as to indicate partiality, passion, caprice or corruption on the part of the jury. The court thought the judgment excessive, and under this ground of complaint sug-

gested, as indicated in the statement of the case, a remittitur of $3000, which the plaintiff accepted under protest, and from this action of the court has appealed and assigned errors, as he has the right to do under the statute above referred to, that the court erred in holding that the verdict of the jury for $8000 is excessive, and in suggesting and requiring a remittitur of $3000, and in setting aside the judgment for $8000, and in entering judgment in favor of plaintiff for $5000 while the defendant appellant, still complaining, insists that "the court erred in not holding that the verdict of $5000 was so excessive as to indicate partiality, passion, caprice or corruption on the part of the jury."

The assignment first was simply that the verdict was excessive, but it was amended to say that "the verdict is so excessive as to indicate partiality, passion and caprice or corruption on the part of the jury," which amendment the court allowed, and the order continued: "Thereupon said motion as amended being heard and understood by the court, the court is of the opinion that the verdict of the jury is excessive, and suggests a remittitur of three thousand ($3000) dollars, which if accepted by the plaintiff said motion of the defendant will be overruled and disallowed, and the former judgment entered on the verdict of the jury will be set aside and a judgment now entered for five thousand ($5000) dollars. Whereupon counsel for plaintiff in open court accepted the said remittitur under protest."

Up until the decision of the case of Telegraph Co. v. Frith, 105 Tenn., 167, 58 S. W., 118, a verdict that was considered excessive by the court did not have to be set aside. Before the passage of the Act the court might suggest a remittitur to the point where it met his approval, and if this was accepted by the plaintiff the necessity for a new trial was avoided, where the proof showed a liability, by the entry of the judgment for this accepted amount. But in cases where the verdict was so excessive as to indicate prejudice, passion, caprice or unaccountable corruption on the part of the jury it was so tinctured with invalidity as that it could not be purged by the process above indicated, and where it appeared to the court the only alternative was to set it aside and grant a new trial. But in the case of Telegraph Co. v. Frith, supra, the practice was changed and both cases brought under the same rule, and might be cured in the same way, and thus avoid the necessity of a new trial. In neither case could the plaintiff be forced to accept the court's action. He could in both cases stand upon his rights and take a new trial rather than accept the court's suggestion. Thus guarded it is a very salutary rule, expediting the determination of litigation and avoiding expensive reinvestigation of other essential questions satisfactorily determined in the partcular suit. While

Section 1 of Chapter 29 of the Acts of 1911 seems to have left the practice unchanged with reference to judgments merely excessive, its application seems to be confined to cases where the judgment is so excessive as to indicate passion, prejudice and caprice, etc. At any rate it gives to the plaintiff in this kind of a case certain rights which he did not have theretofore. Instead of taking a new trial in such case, he may accept the suggestion under protest and appeal. In that event, if there is proof to support a liability, the question for investigation is, not merely is the verdict excessive, but is it so excessive as to indicate passion, prejudice, corruption, partiality or unaccountable caprice on the part of the jury? "And if (by the terms of Section 1 of Chapter 29 of said Act) in the opinion of said Court of Civil Appeals, the verdict of the jury is not so excessive as to indicate passion, prejudice, partiality, corruption or unaccountable caprice on the part of the jury, and the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the Court of Civil Appeals for the full amount originally awarded by the jury in the trial court."

Without regard to the cost of temporary repairs going into bridge No. 6, where the superstructure was torn away, Mr. H. C. Libby, Engineer of Bridges on the Southern Railway, testified that prior to the date of the accident on April 28, 1923 the bridge was an eighty-foot through pin truss span; that is, all the bridge work was overhead; that it was constructed of iron, and that the bridge work extended about twenty feet above the floor of the bridge, approximately. He saw it also April 29th when they had just completed the temporary repairs to get the train out. He testified that he made an estimate of the cost to repair bridge No. 6 where the superstructure was damaged. Asked to tell what had to be done to repair that bridge, approximately what it would cost to put it back in as good condition as it was before the wreck, he replied:

"You would have to purchase new steel bents to replace those torn away by the crane. In addition the trusses were knocked out of line, and new trusses would have to be installed." That the material would cost about two or three hundred dollars, labor about seven hundred dollars, a total of seven hundred dollars, a total of around one thousand dollars. He said that was a fair estimate of the cost of repair and material to repair that bridge No. 6 as to as good condition as before the crane hit it, and that he had checked accurately the material going into this bridge.

It is true he said he might be thirty-three and one-third percent off on $200, which we think should avail to reduce this estimate of

$1000 to about $867 as the cost of the permanent repairs that were necessary for this bridge. He was then asked:

"Q. Now, Mr. Libby, if that bridge No. 5, the one that was wrecked, replaced just as it was before this wreck occurred, tell the court and jury what it would cost to replace it, to restore it as it was?"

This was the question objected to, the outcome of which was set out in the assignment of error heretofore considered, upon the determination of which he was again requested to proceed by this question:

"Q. Tell us, answer the question, Mr. Libby, as to how much it would cost to replace that bridge No. 5 in the condition it was the day this accident occurred, just before the wreck? A. Just previous to this wreck our valuation engineers had taken a complete inventory of the material of this bridge, which was subsequently approved by the Inter-State Commerce Commission, using our accountant's figures on materials in that bridge, and current prices, we estimated it would cost $10,831.73 to replace it."

He was then asked if it was possible to build another bridge there to take the place of the one that was wrecked to serve the purposes of the railroad company and get out at a less cost than the ten thousand dollar figure he mentioned, and he said that it was; that there being a rock foundation in the bed of the stream, concrete piers could be put in there and it could be installed at a cost of $5,812.50; that that figure includes furnishing the necessary deck steel work, deck girder spans, which they had installed at a price of two and one-half cents per pound; that new spans would cost four cents, probably. He testified that "deck spans" meant steel girders; that the ties rest directly on top of two girders running parallel; that the girders in turn support the ties, with rails on the ties; that the railroad company had in stock, and did have in April, 1923, steel girders that would serve the purpose here for two and one-half cents, where if you had to buy new ones the cost would be four cents a pound; that these girders were released from viaducts between Charlotte and Atlanta at the time the new double track was built; that when they built the new double track between Charlotte and Atlanta new and heavier bridges were built to carry their trains; that the material removed for these heavier bridges had become insufficient there, but were sufficient to handle the kind of traffic on the particular grade at Coal Creek, and that bridges 5 and 6 were in good condition and satisfactorily carrying the traffic over their line on April 28, 1923. He was then asked:

"Q. Now, so that the jury can get it all in a figure, one figure would be the estimated cost of repairing this bridge No.

6 and the cost of replacing bridge No. 5 with the material you have in hand, so as to replace the one that was destroyed there, that would be your $1000, plus that other figure? A. $1000 plus $5812.50, or a total of $6,812.50.

"Q. Yes, but that does not include, as I understand you, what was actually paid out to make temporary repairs there until the new bridge can be permanently repaired. A. No sir."

He testified on cross-examination that bridge No. 6 was installed at that point in 1903, and the other in 1904; that they had been used; that No. 5 had been installed at Elk Fork in 1889, and the other originally built in 1888, and were constructed of wrought iron; that steel had mostly succeeded wrought iron in 1893, and had succeeded iron in 1903; that he had used the current prices for steel because wrought iron was not now rolled; that you could not order today and get an iron bridge at the price you could get one for steel. He was asked:

"Q. Now this replacement value of a bridge built in 1888: Have you an itemized statement of what goes into that to make up that $10,831?"

He replied that he had, and filed it later as Exhibit No. 3 to his deposition.

He was examined as to these various items, and it was insisted that by reference to Exhibit No. 3 it would be seen that he charges 113' through truss spans weighing 123,000 pounds would cost $7,995; that whereas by reference to Exhibit 4 of his testimony it is seen that 330' deck girders at an expense of $1.012.50 would take the place of such spans. It was also claimed that by reference to Exhibit No. 3 he was charging an item of $1,531.20 for cross ties, whereas he had stated that each cross tie of such character would cost $1.25 as a fair price delivered there. But this latter did not mean in place. Sawn railroad ties for bridges had to be framed to fit on the bridge, and that the estimate of $1,531.20 included some ties in the trestle approaches as well that had been destroyed; that is, ties from one end to the other. He testified that these ties framed in place, bolted down and laid on were not included in the other items, and he explained later that he did not understand the $1.25 mentioned to apply to railroad bridge ties, which were 8 x 16 x 17 feet, and would cost about $10 apiece, or $1000, and the $531 for labor

Defendant's counsel states that he does not believe this statement, and cites the cross-examination, which developed, we think, the fact that the figures as to the value of the bridge being accepted by the Interstate Commerce Commission was a mistake. Counsel does not believe in the sincerity of this statement as well. Nevertheless it does not appear that at the time the figures were made it was unreasonable valuation.

Defendant also insists that wrought iron had become obsolete, and that the deterioration in the value of this bridge had been such that the value of the temporary bridge put in to replace it satisfied every claim of damages to which plaintiff was entitled, while the plaintiff insists that the cost of this temporary bridge is also an item properly recoverable.

We think defendant's argument as to the value of the bridge at the time it was destroyed, as affected by deterioration, must be mitigated by the fact that repairs are chargeable to and take care to a large extent of this deterioration, and that obsoletion of a wrought iron bridge is not due so much to loss of its carrying capacity, but mostly to the fact that steel is cheaper, and that heavier requirements of the main line have replaced these earlier specifications or materials with a cheaper product which does as well; so that, if one were contracting a new bridge, it would not be essential as a physical requirement to construct it our of the older and more expensive material. However, the same quality of material and character of workmanship, making due and proper allowance for deterioration, is the measure of damage regulating the size of the recovery. A plaintiff could not be compelled to accept a different class of material, and thus have forced upon him a bridge of a different class. The fact, however, that a bridge of equal carrying and lasting capacity can be constructed out of different and cheaper material, would simply be a circumstance affecting the present value of the material to be used in the bridge that had to be replaced. It appears from the proof that it would be more expensive to replace the bridge with iron than with steel, notwithstanding steel is more reliable and costs less.

It also appears that in the item of $7,995 iron is reckoned at current prices, which would make it six and one-half cents per pound in the bridge material. If you should add to the $10,831.73 that it was insisted was the cost of the restoration of bridge No. 5, the sum of $867 as a proper cost of restoring bridge No. 6, it would make the sum of $11,693.73 as the amount plaintiff would be entitled to recover, if you do not take into consideration the deterioration, if any, that the bridge had suffered. This would take no reckoning also of the item of $2,925 and of $27 as temporary repairs. If these items were also included it would make it $14,645.73. These temporary repairs were put in to get out the trains, and to minimize as far as possible the consequential damages that would result. Whether these damages classed under temporary repairs, which are consequential rather than proximate, would be recoverable simply upon allegation and proof of negligence, they were sued for, and the contract of indemnity was "against any and all damages resulting from negligence of the party of the

second part, its servants and employees in and about said industrial track and the right of-way therefor.''

We think, therefore, there is proof that would support a recovery under the .contract of the sum of $14,645.73, but this would not take into consideration any deterioration in the value of these bridges, at least since the figures were furnished to the Inter-State Commerce Commission several years ago. Defendant insists that there is a double charge in the item of $2925 to the extent of $1000, estimated repairs of bridge No. 5, or as herein reduced, $867.00. If this were true there would still be the sum of $13,778.73 as the amount claimed, minus the depreciation, if any, or if you subtract the $8000 which the jury gave from this sum of $13,778.73, it would appear that the sum of $5,778.73 has been credited by the jury to this depreciation account, or some other. Plaintiff has expressed a willingness to accept a substituted bridge estimated to cost $5,812.50, which includes only the cost of the steel at two and one-half cents, because it can be supplied from some other material now owned by the road, rather than four cents, the price of new steel, as indicated by Mr. Libby. If there be added to this the $2,925 and the $27 as temporary repairs, the amount would be $9,764.50, whereas the jury allowed a recovery of only $8000.

The foregoing analysis of the evidence may not be entirely accurate in amounts, as it was not resorted to for the purpose of ascertaining any sum to a nicety. It serves, however, to show that the verdict was within the purview of the evidence, and it does not show that the jury were actuated by any prejudice, passion, unaccountable caprice or corruption, and therefore under the statute, and the assignments of error of the plaintiff, it is entitled to a reversal of the action of the court in requiring the remittitur, and to an affirmance of the judgment as it was originally returned by the jury, unless it should appear to this court from the proof that it is still excessive, though not to the extent indicated, in which event we would still be authorized to present to the plaintiff a further alternative.

It results, therefore, that all of the assignments of defendant appellant are overruled, and the assignments of plaintiff below sustained. The action of the court below requiring the remittitur is therefore reversed, and the judgment of $8000 as originally reported by the jury reinstated. The costs will be paid by the appellant, Black Diamond Coal Company, Inc.

Portrum and Thompson, JJ., concur.